UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MASON CLANCY, an individual,

       Plaintiff,

vs.

JON SMOES,
individually,

TYLER KEMPEMA
individually,

ADAM VANDIS,
individually,

SCOTT DAVIS,
individually,

BRANDON TYBERGAN
individually,

JAMES BOUTWELL
individually,

and
ANGELA MORRISON
individually,

       Defendants,

Case No. 1:22-cv-

**COMPLAINT**

William F. Piper (P38636)
William F. Piper, P.L.C.
Attorney for Plaintiff
1611 West Centre Avenue, Suite 209
Portage, MI 49024
Phone: 269.321.5008
Fax: 269.321.5009

The plaintiff Mason Clancy, by and through his attorney William F. Piper, PLC., for his complaint, states as follows:

## JURISDICTIONAL ALLEGATIONS

1. The plaintiff Mason Clancy is an individual who resides in the County of Kalamazoo, State of Michigan, and he resided there on December 12, 2020.

2. The defendants, upon information and belief, were deputies with a Ottawa County sheriff's department, on December 12, 2020.

3. The events occurred on December 12, 2020, in the counties of Kent and Ottawa, in the State of Michigan.

4. The events complained of were committed by the defendants under color of state law but not under a legitimate expense of governmental authority.

5. Jurisdiction of this case arises under 28 USC § 331 and 28 USC § 1343.

6. The claims in this case arise under 42 USC § 1983.

7. Certain of the causes of action alleged here and arise under the supplemental jurisdiction of this court to hear and decide claims arising under the same transactions and occurrences as the Federal law claims.

## COMMON ALLEGATIONS

8. The plaintiff restates and realleges as fully set forth herein paragraphs 1 – 7 of this complaint.

9. On December 11, 2021 Mr. Clancy was a student who attended Kalamazoo Valley Community College.

10. On December 11, 2020, Mr. Clancy, in the evening, drove to Allendale in a car registered to his father in order to visit his brother, who was a student at Grand Valley State University.

11. Mason Clancy eventually ended up at a party at the Campus View Apartments with about 20 other people, including his brother and a young lady who ended up dying later the following day.

12. Mason Clancy was not drinking alcohol or using drugs at any time during the evening.

13. The young lady who ended up dying was gregarious during the party.

14. Around 2:00 AM or so Mason Clancy, because he had not been drinking alcohol, agreed to drive six young women, including the woman who ended up dying, to the home of his brother Dawson.

15. During the drive the young woman who ended up dying indicated that she wanted to be dropped off at the Laker Apartments to meet a friend.

16. After the young women who ended up dying insisted that she wanted to be dropped off there, and indicated that she was fine, Mr. Clancy dropped her off in the parking lot near the front door of the Laker Apartments.

17. The young woman did not seem to be excessively intoxicated, and she walked away from the car without a problem.

18. Mr. Clancy drove to his brother's apartment and stayed awhile there. Mr. Clancy then drove a few others home. He then returned to his brother's apartment. After that he drove a few more women home.

19. After 4:00 am, Mr. Clancy returned to his brother's apartment and slept there.

20. After waking up around 1:00 pm, Mr. Clancy noticed a black car with a driver seated in it in the parking lot who seemed to be watching his car. He then got into his father's car and drove it, following another car, to a drive through at McDonald's. He noticed that the driver of the black car had followed him to McDonald's.

21. While at the McDonald's Mr. Clancy noticed that the driver of the black car seemed to be discreetly watching him.

22. Mr. Clancy then left McDonalds and proceeded to drive home. He noticed that the driver of the same black car was still following him.

23. Not knowing whether the car was an unmarked police car or some other car, Mr. Clancy, while driving east on Lake Michigan Avenue west of U.S. 131, carefully obeyed the speed limit and all traffic laws, in accordance with his plan to drive home.

24. Nonetheless, a driver of a police car turned on its flashing lights to stop him, and several other police vehicles as well as the black car followed it in doing so.

25. Mr. Clancy pulled off to the side of the road and parked.

26. Nothing happened then for about 2 minutes, as no police officer approached him.

27. Mr. Clancy rolled down his window, and he heard someone yell, "put your hands outside so I can see them and slowly step out of the car". Mr. Clancy complied with the order.

28. Nothing happened for about another 2 minutes, and then a police officer approached Mr. Clancy with his gun pointed at him.

29. Mr. Clancy then noticed that there were about a half dozen police officers, who, upon information and belief, included all of the named defendants except for the defendant

Morrison, in addition to, possibly, some undercover officers, who all pointed pistols and long guns directly at him.

30. Seeing numerous officers pointing guns at him terrified Mr. Clancy.

31. Mr. Clancy was then ordered to take 10 steps back and two steps to the right.

32. Mr. Clancy complied with the order.

33. Someone then ordered Mr. Clancy to get on his knees.

34. Mr. Clancy complied with the order.

35. Several of the defendant officers then ran up to Mr. Clancy, patted him down and handcuffed him behind his back.

36. The defendant officers then stood Mr. Clancy up and walked him over to defendant VanDis's patrol vehicle.

37. Mr. Clancy then asked someone what was wrong.

38. An officer then told him that he couldn't tell him until someone else had arrived there.

39. A female officer whom Mr. Clancy believes was the defendant Morrison then arrived at the scene.

40. Mr. Clancy remained seated in the defendant Van Dis' patrol car vehicle while the other officers were outside talking.

41. The officers then told Mr. Clancy that they were taking him to the police station to question him.

42. The defendant Van Dis then drove Mr. Clancy to the Grand Valley State University police department station, leaving Mr. Clancy's father's car, with Mr. Clancy's phone in it, behind.

43. Officers then placed Mr. Clancy in a room and turned the lights off in it, apparently to intimidate Mr. Clancy.

44. Officers walked back into the room, turned on the lights, and read Miranda Rights to Mr. Clancy.

45. Still not knowing why he had been stopped and arrested, Mr. Clancy agreed to talk.

46. Officers than began asking Mr. Clancy about what happened the previous day, and they asked him a lot of questions about the young woman who had died, without telling Mr. Clancy that she had died.

47. Mr. Clancy then heard his mother yelling from the lobby, and he asked the officers if his family was there.

48. The officers lied and said, "I'm not sure", numerous times.

49. The officer's finally told Mr. Clancy that the girl had died.

50. The officers told Mr. Clancy to stop playing the victim.

51. The officers also told Mr. Clancy that they were taking his phone as evidence, whether he wanted that to happen or not.

52. After a couple of hours of interrogation in which the officers did not let Mr. Clancy see his family, they told him that they would be done if he would write a statement. So Mr. Clancy wrote a statement.

53. The officers took and searched Mr. Clancy's phone, as well as other items of his personal property, including an electric blanket, from the car without consent. Some of the items they never returned.

54. As a result of events described above, the plaintiff has suffered and will continue to suffer emotional distress, a loss of property, humiliation, a loss of enjoyment of life, anger, a loss of liberty, a loss of self esteem and other damages.

### **COUNT I – UNCONSTITUTIONAL ARREST, SEARCHES AND SEIZURES**

55. The plaintiff restates and realleges as though fully set forth herein paragraphs 1-54 of this complaint.

56. The defendants stopped Mr. Clancy without having reasonable or probable cause to do so.

57. The defendants used excessive force against Mr. Clancy, and then handcuffed and arrested Mr. Clancy, and transported him to a police station, against his will, and without having reasonable or probable cause to do so.

58. The defendants patted Mr. Clancy down, searched his phone, searched his car, and removed personal property items in his car, and did not return some of the personal items.

59. The acts by the defendants' violated the Fourth Amendment's prohibition against unreasonable stops, seizures, searches and use of excessive force.

60. The defendants' could not reasonably have believed that their actions described above were lawful or constitutional actions.

WHEREFORE: the plaintiff requested a judgment against the defendants for whatever amount is sufficient to compensate him for his injuries and damages past and future plus punitive damages, all recoverable interest, costs, attorneys fees under 42 USC § 1988, and any other relief this court teams fair and just.

### **COUNT II – INTENTIONAL TORTS**

61.     The plaintiff restates and realleges as though fully set forth herein paragraphs 1-60 of this complaint.

62.     The acts of the defendants set forth above constitute an assault and battery, false arrest and false imprisonment.

63.     As a result of intentional torts set forth above, the plaintiff suffered and will continue to suffer the damages so set forth above.

WHEREFORE:  The plaintiff requests a judgment against the defendants for whatever amount is sufficient to compensate him for his injuries and damages past and future, all recoverable interests, costs, attorneys fees and any other relief this court deems fair and just.

Dated: February 18, 2022                         WILLIAM F. PIPER, PLC.
                                                 Attorney for Plaintiff
                                          By:
                                                 /s/William F. Piper
                                                 William F. Piper (P38636)